**E-Filed 12/16/05**

NOT FOR CITATION

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| EDWARD L. SCARFF, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>WELLS FARGO BANK, N.A., et al.,<br><br>    Defendants. | Case Number C 03-03394 JF (PVT)<br>C 03-04829 JF (PVT)<br><br>ORDER[1] (1) DENYING COMERICA'S AND BURTZEL'S MOTIONS FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT AND (2) OVERRULING COMERICA'S OBJECTION TO AND DENYING COMERICA'S MOTION TO STRIKE THE DECLARATION OF BRITT |

    Defendant Comerica Bank ("Comerica") moves for summary judgment or partial summary judgment as to the ninth and eleventh claims asserted by Plaintiff Edward Scarff ("Scarff"). Defendant Joan Burtzel ("Burtzel") moves for summary judgment or partial summary judgment as to the ninth, eleventh, and twelfth claims asserted by Scarff. The Court has read the moving and responding papers and has considered the oral arguments of counsel presented on

---

[1] This disposition is not designated for publication and may not be cited.


October 7, 2005. For the reasons set forth below, both motions will be denied.

## I. BACKGROUND

On August 16, 2004, Plaintiffs Edward L. Scarff, Nancy V. Scarff, Scarff, Sears & Associates, and Pentoga Partners filed a consolidated amended complaint ("CAC") asserting fifteen claims for relief against Defendants Wells Fargo Bank, N.A., Comerica, Bank of America N.A., Fidelity National Title Co., Computing Resources, Inc., Intuit Inc., Kelly Hvegholm, Carol Barber, Burtzel, Ciccotti, and Carol Huang. Numerous Defendants have been dismissed from this action, and the Court has dismissed many of the remaining claims for relief with respect to specific Plaintiffs and Defendants. By order dated May 23, 2005, the Court outlined the remaining claims, identifying which Plaintiffs may assert them and the Defendants against whom they may be asserted. The claims remaining against Comerica are the ninth, eleventh, and fifteenth, and those remaining against Burtzel are the ninth, eleventh, and twelfth. Of these claims, Edward Scarff may assert all claims, and Nancy Scarff may assert only the fifteenth claim. Comerica now moves for summary judgment on the ninth and eleventh claims only, and Burtzel moves for summary judgment on the ninth, eleventh, and twelfth claims. Because Comerica does not move for summary judgment on the fifteenth claim, Nancy Scarff is not a party to the instant motions for summary judgment.

Unless otherwise indicated, the following facts are undisputed.[2] Scarff had a career as a successful businessman for several decades, which included serving as President and Chief Operating Officer of Transamerica Corporation and as a partner in several investment firms. Carol Huang ("Huang") was employed as a bookkeeper for two of these investment firms, Scarff, Sears & Associates ("SSA") and Pentoga Partners ("Pentoga"). In 1977, Huang began working for Jerre Sears, who would become Scarff's partner when SSA was formed in 1978. Huang

---

[2] Some facts are taken from the CAC, rather than from declarations or other submitted evidence. These facts supply background information that appears to be undisputed and is not critical to the determination of the instant motions.

2

continued working as an assistant to Sears ("Sears"), and by 1983 was listed as an employee of SSA. In 1984, Huang began to work for Pentoga, where she gradually assumed responsibility for all bookkeeping responsibilities. Also, "over time," she took control of some of Scarff's personal finances.

Huang introduced Burtzel to Scarff in 1997. Scarff has testified that he understood that Burtzel, who was employed by Comerica as a Vice President in the Private Banking area from October 31, 1994 until October 10, 2002, solicited his business by contacting Huang. *See* Easterbrook Decl. Ex. 3, p. 210. Burtzel offered Scarff a $1.5 million line of credit. In June 1997, while Burtzel was on vacation, Scarff met with Christine Tompane ("Tompane"), a Comerica loan officer, to sign a "Master Revolving Note" agreement for this line of credit. Huang was present for most of this meeting. Scarff also signed a document entitled "Borrower's Telephone and Facsimile Authorization" ("Phone/Fax Authorization"), which authorized Comerica to honor telephone or fax requests for advances from "the undersigned." The Phone/Fax Authorization was modified to include the words "or my assistant Carol Huang" following "the undersigned." Huang has testified that she typed the words "or my assistant Carol Huang" on her own typewriter after Scarff signed the document, prior to returning the document to Tompane.[3] Easterbrook Decl., Ex. 5, pp. 143-44; *id.*, Ex. 6, pp. 191-93.

In October, 1998, the original $1.5 million note was rewritten as a note for $2 million. In March, 2000, the note was rewritten again to increase the credit line to $3.5 million. The parties dispute whether these October, 1998 and March, 2000 documents bear Scarff's actual signature or a forgery of that signature. Scarff has testified that the signatures on these documents are not his own. *See* Scarff Decl. ¶ 4. However, Comerica argues that because Scarff is willing to identify specific signatures as genuine or forged only when he views them in the context of the

---

[3] Scarff argues that Comerica's assertion that the additions were made before the document was returned by Scarff to Comerica is inconsistent with Huang's testimony that she made the addition after Scarff signed the document. However, Huang has testified that she, not Scarff, delivered the document to Tompane, which is consistent with her testimony that she made the addition after Scarff signed it.

3

1  entirety of each document, it is not undisputed that the signatures are forgeries.

2       A second loan in the amount of $1.8 million was made in March, 2000, the maturity date
3  of which was later extended to August, 2002. Huang has testified that she forged Scarff's initials
4  on the $1.8 million note, but that she cannot tell from looking at the document whether the
5  signature was Scarff's or her forgery of Scarff's signature. *See* Gregory Decl., Ex. L, pp. 199-
6  202. In total, Comerica seeks to recover $5.25 million of unpaid principal. Scarff has testified
7  that from 1997 through 2001, he "paid $1,268,113 to Comerica Bank for fees, interest, and other
8  charges as a result of the credit scheme." Scarff Decl. ¶ 9.

9       Burtzel met with Scarff in person only twice. First, after Burtzel returned from the
10 vacation during which Tompane met with Scarff, Burtzel had a lunch meeting with Scarff at his
11 office in San Francisco. The conversation between Scarff and Burtzel during that meeting
12 included a discussion of the fact that Huang had worked for Scarff for a long time. Second,
13 Burtzel met Scarff, Frank Gaurascio (Burtzel's supervisor), and Huang for another lunch meeting
14 during 1997 or 1998. Burtzel did not speak with Scarff by telephone until September, 2002,
15 when she called to inform him that his $1.8 million loan was due. The remainder of the banking
16 relationship between Scarff and Comerica was carried out entirely through communications
17 between Burtzel and Huang. At Huang's request, Scarff's loan statements were not sent to
18 Scarff, but rather were sent to Burtzel's assistants, Karen Dobbs ("Dobbs") and, subsequently,
19 Renee Allen ("Allen"), and were kept in files in the Comerica office. This was not the bank's
20 standard practice.

21      Between 1997 and 2002, Huang and Burtzel had both a business and a social
22 relationship. Burtzel has testified that she saw Huang "maybe once a quarter, at best," that they
23 alternated paying for lunches or dinners, and that these meals were both business and social
24 meetings. *Id.* at 157-60. Huang has testified that between 1997 and 2002, she saw Burtzel for
25 dinner several—though not more than five—times and for lunch on more than five occasions.
26 *See* Kresse Decl., Ex. A, p. 237. She has also testified that Burtzel invited her to a San Francisco
27 Performance concert and that she invited Burtzel to either a ballet or San Francisco Symphony

28

4

performance on one or two occasions. *See id.* p. 239.

During this period, Huang gave Burtzel several gifts. The evidence relating to these gifts is somewhat vague and, in at least one instance, arguably inconsistent. Burtzel has testified that the gifts she received from Huang included purses, napkins, napkin rings, a photo frame, an address book, necklaces, flowers, travel certificates, a Cartier necklace, and $700 in cash. *See* Easterbrook Decl., Ex. 7, p. 92. She has testified that Huang gave her gifts around the times of Christmas and her birthday and gave her smaller gifts throughout the year. *Id*. at 94. Huang has testified as to the value of some of the gifts, stating that the purse and the scarf together were worth between $500 to $1,000, that the necklace (which "may have been Cartier") was worth less than $500, that the napkins and napkin holders together were worth between $200 and $600, and that the travel voucher was in the amount of $1,500. *See* Gregory Decl., Ex. L, pp. 229-35. Huang states that she does not recall the specific time periods when she gave these gifts, but does state that several of them were given around Christmas time. *Id*.

Burtzel has testified that she returned the cash and the necklace to Huang and did not use the travel certificates. *Id*. at 96. It is not clear which of these gifts she reported to her superiors at Comerica. According to Burtzel, "they [any of her supervisors] had told me to return the Cartier necklace when I brought that to their attention." Gregory Decl., Ex. H, p. 500. However, Beverly Shelton ("Shelton"), Burtzel's superior, has testified that in 2001 or 2002 Burtzel told her that she had received a travel certificate from Huang, but that she does not remember being told about a necklace. *See* Gregory Decl., Ex. B, pp. 20-22. Allen, Burtzel's assistant, recalls Huang giving Burtzel a flower arrangement and a bracelet or a necklace. *See* Gregory Decl., Ex. G, p. 20. Huang and Burtzel both claim that Burtzel did not know of Huang's scheme. Huang states specifically that "I never told Joan Burtzel what I was doing." Kresse Decl., Ex. A, p. 225. Burtzel declared that she did not know of or suspect Huang's scheme. Burtzel Decl., ¶ 7.

In 1997, when Scarff signed the original loan document, he also signed a guaranty in his capacity as a trustee of a family trust. In July, 2002, an updated guaranty form was mailed to Huang in order to be signed by Scarff. This guaranty bears what appear to be the signatures of

5

both Scarff and Burtzel, dated July 15, 2002, . Huang has testified that she forged Scarff's signature on this guaranty. *See* Gregory Decl., Ex. N, pp. 478-79. Burtzel has testified that when she received the guaranty, with a signature that appeared to be Scarff's, she countersigned it as a witness without actually having witnessed Scarff sign the document. *See* Easterbrook Decl., Ex. 7, pp. 176-77. On the same date, Burtzel signed a "Loan Revision/Extension Agreement," which extended the maturity date of the $1.8 million note from June 15, 2002 (30 days prior to the date of the signing of this extension) to August 15, 2002. *See* Easterbrook Decl., Ex. 7, Depo. Ex. 7.

In September, 2002, Burtzel called Scarff to inform him that his $1.8 million loan was due. Soon thereafter, the extent of Huang's scheme was discovered, and Comerica fired Burtzel.

## II. LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the Court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party meets this initial burden, the burden shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. A genuine issue for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *Anderson*, 477 U.S. 242, 248-49; *Barlow v. Ground*, 943 F.2d 1132, 1134-36 (9th Cir. 1991).

"When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" *Devereaux v. Abbey*, 263 F.3d 1070, (9th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S.

1  317, 325 (1986)). Once the moving party meets this burden, the nonmoving party may not rest
2  upon mere allegations or denials, but must present evidence sufficient to demonstrate that there is
3  a genuine issue for trial. *Id.*
4      The standard applied to a motion seeking partial summary judgment is identical to the
5  standard applied to a motion seeking summary judgment of the entire case. *Urantia Foundation*
6  *v. Maaherra*, 895 F.Supp. 1335, 1335 (D. Ariz. 1995).

### III. DISCUSSION

**A. Ninth Claim for Relief: Fraud and Deceit, Secondary Liability**

    Comerica and Burtzel move for summary judgment as to Scarff's ninth claim for relief, in which Scarff alleges that Comerica, Burtzel, and other non-moving defendants, are secondarily liable for fraud and deceit in connection with the alleged "credit line scheme." Scarff alleges that Comerica and Burtzel conspired with and/or aided and abetted Huang in her scheme. The doctrines of conspiracy and aiding and abetting both serve to impose secondary liability on a person who was not herself the tortfeasor.

    The elements of an "action" for civil conspiracy—which is not a claim in itself but rather is "a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration"—are "the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 457 (Cal. 1994) (internal quotation marks omitted). Tort liability for a civil conspiracy is activated by the commission of an actual tort. *Id.* A plaintiff is entitled to damages from "those defendants who concurred in the tortious scheme with knowledge of its unlawful purpose," and that concurrence and knowledge "may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances." *Wyatt v. Union Mortgage Co.*, 598 P.2d 45, 52 (Cal. 1979). Since conspiracy is not an independent tort, it "cannot create a duty or abrogate an immunity," and it

7

Case No. C 03-03394 JF (PVT) and C 03-04829 JF (PVT)
ORDER (1) DENYING COMERICA'S AND BURTZEL'S MOTIONS FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT AND (2) OVERRULING COMERICA'S OBJECTION TO AND DENYING COMERICA'S MOTION TO STRIKE THE DECLARATION OF BRITT
(JFLC1)

"allows tort recovery only against a party who already owes the duty and is not immune from liability based on applicable substantive tort law principles." *Applied Equip.*, 869 P.2d at 459.

Liability for aiding and abetting the commission of an intentional tort is a basis for liability separate from conspiracy liability. *See e.g.*, *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1133-36 (C.D. Cal. 2003). It may be imposed if a person, knowing that another person's conduct constitutes a breach of duty, "gives substantial assistance or encouragement to the other to so act." *Saunders v. Superior Court*, 33 Cal. Rptr. 2d 438, 446 (Ct. App. 1994). In order to be held liable for aiding and abetting, an aider and abettor must have "actual knowledge of the primary violation." *Neilson*, 290 F. Supp. 2d at 1119.

Comerica moves for summary judgment with respect to both conspiracy and aiding and abetting liability on the ground that there is no evidence that Comerica had actual knowledge of Huang's scheme. Comerica argues that there is no direct evidence that Burtzel or any other Comerica employee had actual knowledge of the scheme, and that the circumstantial evidence is not enough to allow a reasonable jury to infer such knowledge. The Court agrees that there is no direct evidence of actual knowledge. However, although it is a close question, the Court concludes that Plaintiff has presented enough circumstantial evidence to survive summary judgment.

A reasonable jury could conclude that Huang and Burtzel are not being truthful in their statements that Burtzel did not have knowledge of Huang's scheme, and, based on the available evidence, reasonably could infer that Burtzel did in fact have such knowledge. At least two categories of circumstantial evidence, both of which cast doubt on Burtzel's truthfulness, are particularly troubling. First, Burtzel's testimony that she reported Huang's gift of a Cartier necklace to her supervisors is inconsistent with her supervisor Shelton's testimony that she only recalls Burtzel having reported receiving the travel certificates. *See* Gregory Decl., Ex. H, p. 500; *id.*, Ex. B, pp. 20-22. Second, a reasonable jury could infer knowledge from Burtzel's actions on or about July 15, 2002. On June 15, 2002, the $1.8 million note, originally loaned in March, 2000, matured. However, it was not until thirty days *after* the maturity date that two

8

documents were signed allowing for the extension of this date. The updated guaranty form, dated July 15, 2002, bears what appear to be the signatures of both Scarff and Burtzel. *See* Easterbrook Decl., Ex. 7, Depo. Ex. 5. Huang has testified that she forged Scarff's signature on this guaranty. *See* Gregory Decl., Ex. N, pp. 478-79. Burtzel has testified that when she received the guaranty, she countersigned it as a witness without actually having witnessed Scarff sign the document. *See* Easterbrook Decl., Ex. 7, pp. 176-77. A "Loan Revision/Extension Agreement," also dated July 15, 2002 and bearing what appear to be the signatures of Scarff and Burtzel, extended the maturity date of the $1.8 million note from June 15, 2002 to August 15, 2002. *See* Easterbrook Decl., Ex. 7, Depo. Ex. 7.[4]

The inconsistent testimony regarding which gifts Burtzel reported to her supervisors along with Burtzel's admission that she falsely witnessed a signature, resulting in the extension of a loan maturity date that had already passed, might not on their own be sufficient evidence from which a reasonable jury could infer actual knowledge. However, when this evidence is combined with the additional evidence, there is just enough circumstantial evidence from which a reasonable jury could infer actual knowledge.

Given the high value of the loans, one reasonably might question why Burtzel communicated almost exclusively with Huang. Burtzel met with Scarff in person only twice, the first time at his office sometime after Scarff initially met with Tompane in June, 1997, and the second time over lunch in 1997 or 1998. *See* Kresse Decl., Ex. C, pp. 145-55. She spoke with him on the telephone only once, four or five years after these initial meetings, when she called in September, 2002, to inform him that his $1.8 million loan was due. *See id.* pp. 54-58, 157. In

---

[4] At the October 7, 2005 hearing, Scarff's attorney argued that Philip Gould ("Gould") has testified that Scarff's credit requests would not have been granted if Burtzel had not obtained the original and updated guaranties. However, in the excerpts of Gould's deposition submitted into evidence, it is not clear that Gould's testimony includes this conclusion. In response to the question, "And was [the guaranty by the Edward and Nancy Scarff 1985 trust] something that you took into consideration in approving the credit request?", Gould answered "Yes." Gregory Decl., Ex. C, p. 27. That Gould took the guaranty into consideration does not necessarily mean, though it *could* mean, that the credit requests would not have been granted without it.

contrast to her very limited communication with Scarff, Butzel saw Huang regularly for lunches, dinners, or other social activities.

Additionally, the evidence that Scarff's loan statements were not sent to Scarff, but rather to Burtzel's assistants, could lead a reasonable jury to infer that Burtzel had actual knowledge of Huang's illegal activities. At Huang's request, Scarff's loan statements were sent to Burtzel's assistants, Dobbs and, subsequently, Allen. Dobbs has testified that Huang called to request that the statements be sent to Dobbs at the bank because "Mr. Scarff traveled a lot and that [Huang] would take a lot of time off, and she didn't want them to get into the wrong hands." Gregory Decl., Ex. E, pp. 40-41. Dobbs would later deliver them to her or send a messenger. *See id.*, p. 42. Allen, who replaced Dobbs, continued to receive Scarff's statements at the bank. *See* Gregory Decl., Ex. G, pp. 12, 26-27. Allen has also testified to meeting with Huang approximately a dozen times for coffees and dinners at nice restaurants, and that Huang always paid for these coffees and dinners. *See id.*, pp. 18-19. It was not the bank's usual practice to keep clients' bank statements. Shelton, Burtzel's supervisor, has testified that generally a client's statements are sent to that client. *See* Gregory Decl., Ex. B, p. 46. Dobbs has testified that she did not recall ever receiving statements on behalf of other clients. *See* Gregory Decl., Ex. E, p. 42.

Comerica argues that it is impossible to conclude from the evidence in the record that either Comerica or Burtzel, its agent, had any motivation to conspire with or aid and abet Huang in her scheme. The Court agrees that a reasonable jury could not conclude that the bank itself would have such a motivation. However, it is possible that a reasonable jury could infer, based upon the evidence discussed above, that Burtzel had such a motivation, whether because of the gifts she received, her social relationship with Huang, or the increased bonus compensation she received because of the new business that she brought to the bank.[5]

---

[5] Burtzel's bonus compensation was based on the amount of new business that she brought to the bank. *See* Gregory Decl., Ex. A, pp. 17-18.

10

Case No. C 03-03394 JF (PVT) and C 03-04829 JF (PVT)
ORDER (1) DENYING COMERICA'S AND BURTZEL'S MOTIONS FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT AND (2) OVERRULING COMERICA'S OBJECTION TO AND DENYING COMERICA'S MOTION TO STRIKE THE DECLARATION OF BRITT
(JFLC1)

1    Comerica also argues that "suspicion and surmise do not constitute actual knowledge." *Casey v. U.S. Bank National Ass'n*, 26 Cal. Rptr. 3d 401, 407 (Ct. App. 2005). In *Casey*, the court concluded that *allegations* of suspicion and surmise were not sufficient to survive a motion to dismiss. *Id*. at 409. However, when knowledge is properly alleged, it may be inferred from circumstantial evidence. *See, e.g.*, *Wyatt*, 598 at 52 (knowledge "may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances").

In addition to joining in the arguments for summary judgment presented in Comerica's motion, Burtzel makes two additional arguments. First, she argues that there is insufficient evidence that she made intentional misrepresentations to or fraudulently concealed facts from Scarff. This argument is based on a misunderstanding of Scarff's claim as one for direct rather than secondary liability. As stated above, liability for conspiracy and aiding and abetting does not require that the defendant committed the underlying tort. Conspiracy requires that the defendant "concur[] in the tortious scheme with knowledge of its unlawful purpose." *Wyatt*, 598 P.2d at 52. Aiding and abetting requires that the defendant "gives substantial assistance or encouragement" to another person, knowing that his or her conduct constitutes a breach of duty. *Saunders*, 33 Cal. Rptr. 2d at 446. Second, Burtzel argues that there is no evidence that Scarff suffered any damages. However, Scarff has testified that from 1997 through 2001, he "paid $1,268,113 to Comerica Bank for fees, interest, and other charges as a result of the credit scheme." Scarff Decl. ¶ 9.

Accordingly, Comerica's and Burtzel's motions for summary judgment on the ninth claim will be DENIED. Although in the Court's opinion the evidence for such an inference is not strong, a reasonable jury could infer that Burtzel, Comerica's agent, had actual knowledge of Huang's scheme.

11

**B. Eleventh Claim for Relief: Negligence**

Comerica and Burtzel move for summary judgment as to Scarff's eleventh claim for relief, in which Scarff alleges that Comerica and Burtzel are liable for negligence in connection with the alleged "credit line scheme." Comerica argues first that the bank owed no duty to Scarff because Scarff was not a customer of the bank, and second that, assuming the necessary relationship, the bank owed no duty to Scarff. "To the extent it presents solely an issue of law, the question of whether a duty exists may be resolved on a motion for summary judgment." *Nymark v. Heart Fed. Savings & Loan Assn.*, 283 Cal. Rptr. 53, 56 (Ct. App. 1991).

Comerica's first argument—that, assuming that Scarff's purported signatures were forgeries, Scarff was not in fact a customer of the bank—is without merit. It is true that bank generally does not owe a duty of care to a non-customer. *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*, 56 Cal. Rptr. 2d 756, 760 (Ct. App. 1996) ("Appellants are not customers or *past customers* of the banks or the brokerage firms. They are, therefore, strangers to the contractual relationships between respondents and the thieves.") (emphasis added). However, there is sufficient evidence in the record that Scarff was a customer (or, at the very least, a past customer) of Comerica, even if all of his allegations of forgery are true. In June, 1997, Scarff met with Tompane, a Comerica loan officer, to sign a "Master Revolving Note" agreement for a $1.5 million note. *See* Easterbrook Decl., Ex. 3, pp. 211-16 and Depo. Ex. 103. Subsequently, Burtzel met with Scarff in person on two occasions and, when the $1.8 million loan was due, called Scarff on the telephone. *See* Kresse Decl., Ex. C, pp. 54-58, 145-55.

Comerica's second argument—that, assuming the necessary relationship, the bank owed no duty to Scarff—is also unpersuasive. The Court agrees with Comerica that a duty of care does not generally arise out of the relationship between a lender and a borrower. *See, e.g.*, *Nymark*, 283 Cal. Rptr. at 56 ("as a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money"). However, this general rule does not universally preclude a lender from owing a duty of care to a borrower. The *Nymark* court held that "the test

12

for determining whether a financial institution owes a duty of care to a borrower-client "involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm.'" *Nymark*, 283 Cal. Rptr. at 58 (citing *Connor v. Great Western Sav. & Loan Assn.*, 69 Cal. 2d 850, 865 (1968) (quoting *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958)); *see also Knox v. Ameriquest Mortg. Co.*, 2005 WL 1910927, at *5 (N.D. Cal. Aug. 10, 2005).

Applying the foregoing factors to this case, a reasonable jury could conclude that Burtzel and Comerica owed a duty to Scarff. First, it is clear that the transactions at issue were intended to affect Scarff; he was the borrower of significant sums from Comerica. Second, a reasonable jury could conclude that harm to Scarff was foreseeable. There is evidence in the record that Burtzel had very little direct communication with Scarff and that her conduct with respect to Scarff's account was sufficiently deviant from standard banking practices that a person in Burtzel's position could have foreseen that harm to Scarff would occur.[6] Additionally, the declaration of John Britt ("Britt"), which includes descriptions of and references to industry customs for private banking, provides further evidence that Burtzel's conduct was abnormal.[7]

---

[6] For example, Burtzel has testified that she met with Scarff in person only twice and spoke with him on the telephone only once, when she called to inform him that his $1.8 million loan was due. *See* Kresse Decl., Ex. C, pp. 54-58, 145-55, 157. Additionally, it was not standard practice for Comerica to keep a borrower's statements at the bank, as Burtzel and her subordinates did with Scarff's statements. *See* Gregory Decl., Ex. B, p. 46; *id.*, Ex. E, p. 42.

[7] Comerica objects to Britt's declaration on the ground that it lacks foundation. The Court finds that sufficient facts have been presented to establish Britt as an expert for the purpose of the motions for summary judgment, and will OVERRULE Comerica's objection. Britt's curriculum vitae details the relevant jobs and experiences Britt has had in the financial services industry for over four decades. *See* Britt Decl. Ex. A.

Comerica moves to strike Britt's entire declaration on the ground that it includes improper legal conclusions. However, the declaration includes more than legal conclusions; it

*See, e.g.,* Britt Decl. ¶¶ 3, 4, 5, 6, 8, 10, 12, 15, 21, and 22. Comerica argues that internal procedures and industry standards cannot be used as the basis of establishing a duty because they exist for the benefit of banks and not customers. *See, e.g.*, *Fireman's Fund Ins. Co. v. Security Pacific Nat. Bank*, 149 Cal. Rptr. 883, 904 (Ct. App. 1978). However, while this internal policy may not "establish the existence of such a duty when contrary to both statutory and common law," it may be used as "evidence of breach of duty" as long as it is not contrary to statutory and common law. *Id.* Third, given Scarff's testimony that he paid $1,268,133 to Comerica in fees, interest, and other charges, it is reasonably certain that Scarff suffered injury. *See* Scarff Decl. ¶ 9. Fourth, a reasonable jury could conclude that the conduct of Burtzel was closely connected to Scarff's alleged injury. Fifth, where borrowers are in a position to protect themselves from loss, California courts have held that no moral blame attaches. *See, e.g.*, *Fox & Carskadon Financial Corp. v. San Francisco Fed. Sav. & Loan Assn.*, 125 Cal.Rptr. 549, 552 (Ct. App. 1975). In the instant case, a reasonable jury could conclude that Scarff was not in such a position.[8] Also, given that a reasonable jury could conclude that Burtzel was a knowing participant in Huang's scheme, as explained above, there is a possibility that a jury would attach significant moral blame to the conduct of Defendants. Even if a jury concluded only that Burtzel deviated significantly from standard bank policy because of her friendship with Huang, and not that she was a knowing participant, a jury could conclude that her conduct was morally blameworthy. Sixth, and finally, there is strong public policy favoring liability of banks if and when they or their agents cause

---

also includes statements about industry practice. Accordingly, the Court will DENY Comerica's motion to strike. To the extent that Britt improperly expresses legal conclusions about the duty that a bank owes to a borrower, the Court does not rely on these statements. For the purpose of the instant motions for summary judgment, the Court considers Britt's declaration only to the extent that it provides evidence from which a reasonable jury could conclude that it was foreseeable that Burtzel's conduct would cause harm to Scarff.

[8] Burtzel has testified that she met with Scarff in person only twice and spoke with him on the telephone only once, when she called to inform him that his $1.8 million loan was due. *See* Kresse Decl., Ex. C, pp. 54-58, 145-55, 157. Scarff's statements were not sent to him, but were instead kept at the bank. *See* Gregory Decl., Ex. E, pp. 40-41; *id.*, Ex. G, pp. 12, 26-27.

14

significant financial loss to their banking customers through fraud or negligence. Thus, a reasonable jury could conclude that Burtzel and Comerica owed a duty to Scarff.

Scarff also alleges, in very general terms, that Burtzel and Comerica owed him a duty to follow federal and state banking laws. Comerica argues that there was no basis for this alleged duty, and Scarff does not articulate such a basis. Having concluded that there is a common law duty, the Court need not decide the question of whether a duty also arises out of federal and state banking laws.

In addition to joining in the arguments for summary judgment presented in Comerica's motion, Burtzel again argues that Scarff suffered no damages as a result of her establishment of lines of credit at Comerica. Scarff has testified that from 1997 through 2001, he "paid $1,268,113 to Comerica Bank for fees, interest, and other charges as a result of the credit scheme." Scarff Decl. ¶ 9. In addition, Burtzel argues that Scarff's own negligence is an affirmative defense to allegations of negligence by Burtzel. However, Burtzel cites no evidence of Scarff's negligence.

Accordingly, the instant motions for summary judgment on Scarff's eleventh claim will be DENIED. A reasonable jury could infer from the evidence in the record that Burtzel and Comerica owed a duty to Scarff.

**C. Twelfth Claim for Relief: 12 U.S.C. § 503 and 18 U.S.C. § 215**

Burtzel moves for summary judgment as to Scarff's twelfth claim for relief, in which he alleges liability pursuant to 12 U.S.C. § 503 and 18 U.S.C. § 215. Under § 215, it is a crime if "an officer, director, employee, agent, or attorney of a financial institution, corruptly solicits or demands for the benefit of any person, or corruptly accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution." 18 U.S.C. § 215(2). Section 503 creates individual liability for a director or officer who *knowingly* violates 18 U.S.C. § 215, or one of several other banking statutes. *See* 12 U.S.C. § 503.

15

1    Burtzel first argues that Scarff cannot prove damages as a result of his establishment of
2 lines of credit at Comerica. For the reasons discussed above, this argument is without merit.
3 Scarff has testified that from 1997 through 2001, he "paid $1,268,113 to Comerica Bank for fees,
4 interest, and other charges as a result of the credit scheme." Scarff Decl. ¶ 9.
5    Burtzel also argues that Scarff cannot prove that she had a knowing, corrupt intent. She
6 contends that it is undisputed that she returned or did not use the most valuable gifts: the Cartier
7 necklace, $700 in cash, and the two travel certificates. However, she cites only to her own
8 testimony to the effect that she reported her receipt of the Cartier necklace to Shelton, her
9 supervisor, and that she returned it to Huang. *See* Kresse Decl., Ex. C, pp. 73-74. This evidence
10 is not undisputed: Shelton has testified that she only recalls that Burtzel reported having received
11 the travel certificates. *See* Gregory Decl., Ex. B, pp. 20-22. Burtzel also contends that her own
12 denial of having knowingly participated in Huang's scheme is determinative. However, a
13 reasonable jury could disbelieve Burtzel's denials. For the reasons stated above with regard to
14 the Scarff's ninth claim, the Court finds that a reasonable jury could infer from the evidence in
15 the record that Burtzel, Comerica's agent, had actual knowledge of Huang's scheme.
16 Accordingly, the Court will DENY Burtzel's motion for summary judgment on the twelfth claim.

### IV. ORDER

   Good cause therefore appearing, IT IS HEREBY ORDERED that the instant motions for summary judgment are DENIED. IT IS FURTHER ORDERED that the objection to the Britt declaration is OVERRULED and the motion to strike the Britt declaration is DENIED.

DATED: December 16, 2005

/s/ electronic signature authorized
JEREMY FOGEL
United States District Judge

16

Case No. C 03-03394 JF (PVT) and C 03-04829 JF (PVT)
ORDER (1) DENYING COMERICA'S AND BURTZEL'S MOTIONS FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT AND (2) OVERRULING COMERICA'S OBJECTION TO AND DENYING COMERICA'S MOTION TO STRIKE THE DECLARATION OF BRITT
(JFLC1)

1  This Order has been served upon the following persons:

| | | |
|---|---|---|
| 2 | Rebecca M. Archer | EfilingRMA@cpdb.com, rmg@cpdb.com |
| 3 | Jonathan R. Bass | EfilingJRB@cpdb.com, mjc@cpdb.com |
| 4 | William Bates , III | bill.bates@bingham.com |
| 5 | Carolyn Chang | cchang@fenwick.com, vschmitt@fenwick.com |
| 6 | A. Marisa Chun | EfilingAMC@cpdb.com, pjd@cpdb.com |
| 7 | Joseph W. Cotchett | plee@cpsmlaw.com, |
| 8 | Joseph N. Demko | JND@JMBM.com, eap@jmbm.com |
| 9 | John W. Easterbrook | jwe@hopkinscarley.com, dgraff@hopkinscarley.com |
| 10 | William Henry Gavin | gavin@gclitigation.com, |
| 11 | Philip L. Gregory | pgregory@cpsmlaw.com, jacosta@cpsmlaw.com |
| 12 | Alan F. Hunter | hunter@gclitigation.com, |
| 13 | Susan K. Jamison | EfilingSKJ@cpdb.com, aaa@cpdb.com |
| 14 | William S. Klein | bklein@hopkinscarley.com, ttellez@hopkinscarley.com |
| 15 | Martin H. Kresse | mkresse1@earthlink.net, |
| 16 | C. Laine Lucas | lainelucas@bindermalter.com, |
| 17 | Frank M. Pitre | fpitre@cpsmlaw.com, mnewman@cpsmlaw.com |
| 18 | Elizabeth C Pritzker | epritzker@cpsmlaw.com, zml@girardgibbs.com |
| 19 | Dori Lynn Yob | dyob@hopkinscarley.com, ash@hopkinscarley.com |

Jennifer Coleman
Jeffer Mangels Butler & Marmaro LLP
Two Embarcadero Center, Fifth Floor
San Francisco, CA 94111-3824

Tod C. Gurney        tgurney@hopkinscarley.com, ttellez@hopkinscarley.com
Hopkins & Carley
70 S. First Street
San Jose, CA 95113

Nanci E. Nishimura
Cotchett Pitre Simon & McCarthy
840 Malcolm Road, Suite 200
Burlingame, CA 94010

17

Case No. C 03-03394 JF (PVT) and C 03-04829 JF (PVT)
ORDER (1) DENYING COMERICA'S AND BURTZEL'S MOTIONS FOR SUMMARY JUDGMENT OR PARTIAL
SUMMARY JUDGMENT AND (2) OVERRULING COMERICA'S OBJECTION TO AND DENYING COMERICA'S
MOTION TO STRIKE THE DECLARATION OF BRITT
(JFLC1)